UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**26-CR-20122-BECERRA/TORRES**
Case No. _____

18 U.S.C. § 1115

UNITED STATES OF AMERICA

v.

YUSIEL LOPEZ INSUA,

   Defendant.

_____/

FILED BY _____**BM**_____ D.C.

**Mar 31, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

#### Summary

1.     On or about July 28, 2025, Yusiel Lopez INSUA operated a 25-foot tugboat that was affixed to, and pushing, a 108 feet long, 28 feet wide, and 149 gross ton construction barge (collectively "the Vessel").  INSUA was attempting to traverse a section of Biscayne Bay in Miami-Dade County, in the Southern District of Florida.  On that day, INSUA ran over, capsized, and crushed a stalled sailboat carrying Victim 1 (7 yo), Victim 2 (13 yo), Victim 3 (10 yo), Victim 4 (7 yo), Victim 5 (8 yo) , and manned by Victim 6 (adult).  Thereafter, Victims 4, 5, and 6 escaped being pulled under water as the barge continued to travel on top of the capsized sailboat, submerging it and pinning it under the barge's hull.  However, Victim 1, Victim 2, and Victim 3 were trapped in the wreckage of the sailing vessel underneath the barge.  Victims 1, Victim 2, and Victim 3 perished by drowning.

**The Defendant, Related Persons, and Companies**

2.      Victim 6, an adult female, operated a Hobie Getaway-type sailboat ("the Sailboat") upon Biscayne Bay belonging to, and on behalf of, a sailing camp.  Victim 1 (7 yo), Victim 2 (13 yo), Victim 3 (10 yo), Victim 4 (7 yo), and Victim 5 (8 yo) were campers at the sailing camp and passengers aboard the Sailboat.  The Sailboat was a polyethylene, catamaran sailing vessel approximately 17-feet in length.  The sailing mast was approximately 13 feet, 6 inches tall.  The Sailboat's sole means of propulsion was wind and sail.



*A Hobie Getaway sailboat*

3.      Company 1 was a Florida corporation engaged in construction.  Company 1 owned and controlled operation of the tugboat "Wood Chuck" ("the tugboat") Identification No. FLZN6951A291, Vessel Registration No. FL9726HG and a floating barge identified as FB 70 ("the barge").

4.      The barge had no independent capacity for steering or propulsion.

5.      The tugboat was equipped with twin diesel reduction engines controlled from the helm of the tugboat's pilothouse.

6.     The pilothouse was elevated above the main deck of the tugboat.  Propulsion and direction were achieved with two throttles and a steering mechanism located at the helm.

7.     The tugboat was affixed to the rear of the barge to steer and propel the barge.



*Barge and Tugboat (The Vessel)*

8.     The barge had a structure or deckhouse welded onto the rear of the platform (pictured above).

9.     A construction crane sat on the barge, and forward of the deckhouse (pictured above).

10.     The Vessel and the Sailboat operated on Biscayne Bay in the Southern District of Florida.  Biscayne Bay constituted inland waters of the United States pursuant to 33 C.F.R. § 83.01 and was a navigable water of the United States within Miami-Dade County, Florida and within the admiralty jurisdiction of the United States.

11.     Individual 1, a citizen of the United States, was the owner and operator of Company 1 and the Vessel.

3

12. Yusiel Lopez INSUA, a citizen of the United States, was the operator of the Vessel as an employee or contractor working for Company 1. He had been operating the Vessel for Company 1 for approximately twelve years, including making numerous voyages at the helm of the Vessel in Biscayne Bay.

13. Individual 2, a Cuban national present in the Southern District of Florida as a lawful permanent resident, was a construction worker who was an employee or contractor working for Company 1 for approximately seven years.

## The Incident

14. In or around July 2025, Company 1 was engaged in the lawful deconstruction of a seawall at a private residence located on Star Island along Biscayne Bay.

15. On or about July 27, 2025, INSUA, Individual 2, and others pulled construction material from the seawall and subsequently loaded it onto the barge on behalf of, and in the scope of employment with, Company 1. INSUA and Individual 2 intended to transport the construction debris to an empty lot on Di Lido Island across Biscayne Bay to offload the material into waiting vehicles for disposition.

16. On or about July 28, 2025, at approximately 10:55 a.m., INSUA piloted the Vessel and steered and operated propulsion from the Vessel's pilothouse enroute across a portion of Biscayne Bay to the lot on Di Lido Island. Individual 2 was on the deck of the barge.

17. Before and during INSUA's operation of the Vessel, various motor and sailing vessels operated in this area of Biscayne Bay, including the Sailboat operated by Victim 6 and carrying the children mentioned above.

4

18. Victim 6 navigated the Sailboat from the Miami Yacht Club towards Flagler Monument Island on Biscayne Bay as part of the sailing camp's activities. However, the Sailboat operated by Victim 6 stalled due to lack of wind.

19. Individual 2 was in or near the deckhouse during the time leading up to and when the Sailboat lost propulsion. He walked toward the rear of the barge portion of the Vessel.

20. INSUA did not change course or alter the Vessel's speed after the Sailboat lost wind propulsion and while Individual 2 was at the rear of the Vessel.

21. Having lost propulsion and in the path of the oncoming Vessel, Victim 6 stood up and attempted to alert the oncoming Vessel.

22. INSUA did not change course or alter the Vessel's speed as Victim 6 attempted to alert them of her stalled position.

23. INSUA crashed the Vessel into the Sailboat in the vicinity of Hibiscus Island in Biscayne Bay.



*Intended route of the Vessel (purple) and the Sailboat (orange)
and approximate point of impact (yellow pin)*



24.    After impact, Individual 2, who was still at the rear of the barge, ran toward the front of the Vessel.  The Vessel continued to move over the Sailboat after the initial impact without a change in course or speed. Individual 2 went back to the rear of the barge portion of the Vessel, and INSUA eventually turned off the Vessel's engines.

25.    Victim 4, Victim 5, and Victim 6 escaped being dragged under the Vessel.  Victim 6 and others attempted to rescue Victim 1, Victim 2, and Victim 3; however, they were entangled in the Sailboat's wreckage that was pinned up against the bottom of the Vessel.  First responders eventually pulled Victim 1, Victim 2, and Victim 3 from the wreckage, and transported them for emergency medical care.

26.    Victim 1 and Victim 2 were pronounced dead on the day of the collision.  Victim 3 initially survived and remained in critical condition until she died on July 30, 2025.

27.    Medical professionals determined that Victim 1, Victim 2, and Victim 3 drowned to death.

## Factors

28.     INSUA transitioned across this section of the Biscayne Bay waterway prior to July 28, 2025, and saw sailing vessels, like the Sailboat encountered on July 28, 2025, operating in this area, on those prior occasions.

29.     INSUA had "near misses" with sailboats in this section of Biscayne Bay prior to July 28, 2025.

30.     INSUA knew, or should have known, that sailboats are wind driven, and likely lack alternative means of propulsion; therefore, their lack of maneuverability was reasonably foreseeable when there was little to no wind.

31.     INSUA knew, or should have known, to maintain awareness of all factors that could affect the maneuverability of the Sailboat and other vessels on the waterway, including all weather conditions, especially wind.

32.     On July 28, 2025, INSUA had "long range" visibility from the pilothouse on the tugboat portion of the Vessel, but he did not have visibility directly in front of the barge which was blocked by the crane on the barge.

33.     The crane on the barge deck was located near the deckhouse. Concrete debris and other materials from the seawall which Company 1 and its employees or contractors were deconstructing covered the main deck of the barge.

34.     Both the deckhouse on the barge immediately in front of the tugboat's pilothouse, and the crane in front of that deckhouse, obstructed waterline visibility directly in front of the Vessel.



35. INSUA knew, or should have known, that the position of the deckhouse and the crane on the barge portion of the Vessel obstructed the waterline view of a pilot operating the Vessel from the tugboat's pilothouse.

36. The Sailboat's sails were bright colored, raised, and extended in the time leading up to impact. The sail and mast were taller than the barge, crane housing, and the deckhouse. The Sailboat was on the Vessel's port side during the time leading up to impact.

37. The Vessel's pilothouse had windows on its port and starboard sides that provided visibility to both sides of the barge.

38. INSUA's cellular telephone was unlocked during the transit time leading up to the collision and indicated activity on internet marketplaces, including at the time when the collision occurred.

39. INSUA was unable to see what was in front of the Vessel; therefore, INSUA should have employed alternative means to avoid collision with stationary objects and other vessels. These alternative means could include, but are not limited to, radars or cameras. INSUA knew the Vessel was not so equipped.

40. When there is no direct line of sight immediately in front of a vessel, and when a vessel is not otherwise equipped to increase visibility, a reasonably prudent vessel operator should assign personnel aboard to act as a lookout, including sufficient personnel to effectively perform the functions of a lookout.

41. Individual 2 was on the barge portion of the Vessel. Acting as a lookout was not in the scope of Individual 2's employment, and neither Individual 1 nor INSUA directed him to act as a lookout.

42. Individual 2 was in or near the deckhouse during the time leading up the collision.

43. INSUA knew, or should have known, that at least one lookout on the Vessel was necessary for safe operation of the Vessel given the limited visibility in front of the Vessel from the deckhouse and the lack of other safety equipment, including radios, that could have increased front-facing visibility.

44. INSUA, as pilot of the Vessel, was responsible for ensuring the safe operation of the Vessel, to include full visibility in the waters in which the Vessel was operating. INSUA was responsible for appointing a lookout to make the operation of the Vessel safe and for supervising the lookout to ensure consistent and faithful performance of these duties.

45. At the time of the collision, all the pilothouse's windows were closed. The noise emitted by the diesel engines, the distance/ height of the rear of the barge to the pilothouse, in addition to the closed windows, made verbal communication difficult.

46.     Boaters use Channel 16 to communicate emergencies to other vessels.  However, the radio in the Vessel's pilothouse was set to Channel 9, which is a channel used to communicate with bridge operators.  There are no bridges en route from the construction site on Star Island to the debris drop off point on Di Lido Island.

47.     If an operator or owner considers their vessel restricted in its ability to maneuver ("RAM"), per 33 C.F.R. § 83.03, then they are required to display day shapes (three dimensional, geometric objects hoisted and made visible to other mariners).  The Vessel was not equipped with day shapes.

48.     Due to these factors, and others, INSUA maintained course and speed until ramming the Sailboat, and even after.

### Navigation Rules

49.     The United States Navigation Rules (the Rules) are codified in 33 C.F.R. § 83, *et seq.*

50.     In accordance with 33 C.F.R. § 83.01(a), all vessels operating on the inland waters of the United States must follow the vessel navigation rules provided in 33 C.F.R. § 83.  The portion of Biscayne Bay where the Vessel transited is an inland waterway in the United States.

51.     Biscayne Bay is not a narrow channel; therefore, 33 C.F.R. § 83.09 is not applicable.

52.     33 C.F.R. § 83.18(a)(iv) states, "[a] power-driven vessel underway shall keep out of the way of: . . . [a] sailing vessel."

53.     33 C.F.R. § 83.05 states, "[e]very vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing

circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."

54.     33 C.F.R. § 83.17(a)(ii) and (b) requires vessels who have the right of way to "take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with [the Rules]" and when finding herself "so close that collision cannot be avoided by the action of the give-way vessel alone, [must] take such action as will best aid to avoid collision."

55.     33 C.F.R. § 83.06(a)(ii) and (iv) requires every vessel to proceed "at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions" given the "traffic density" and "the state of wind…"

56.     33 C.F.R. § 83.07(a) states, "[e]very vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist."

57.     33 C.F.R. § 83.08(a) states "[a]ny action taken to avoid collision shall be taken in accordance with the Rules of [ ] subpart (Rules 4-19) (§§ 83.04 through 83.19) and shall, if the circumstances of the case admit, be positive, made in ample time and with due regard to the observance of good seamanship."  Per § 83.08(f)(iii), "a vessel the passage of which is not to be impeded remains fully obligated to comply with the Rules [ ] Subpart B (Rules 4-19) when the two vessels are approaching one another so as to involve risk of collision."

58.     33 C.F.R. § 83.34(d) states that "[w]hen vessels in sight of one another are approaching each other and, from any cause, either vessel fails to understand the intentions or actions of the other, or is in doubt whether sufficient action is being taken by the other to avoid

11

collision, the vessel in doubt shall immediately indicate such doubt by giving at least five short and rapid blasts on the whistle."

59.     33 C.F.R. § 83.02(a) states that the Rules do not "exonerate any vessel, or the owner, master or crew thereof, [of any negligence for failure to comply with the Rules or failure to take] any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

60.     33 C.F.R. § 83.02(b) states that "[i]n construing and complying with [the Rules] due regard shall be had to all danger of navigation and collision and to any special circumstances, including the limitations of the vessels involved, which may make departure from [the Rules] necessary to avoid immediate danger."

[REMAINDER INTENTIONALLY LEFT BLANK]

## COUNT 1
### Seaman's Manslaughter
### (18 U.S.C. § 1115)

61.     On or about July 28, 2025, on Biscayne Bay, in Miami-Dade County, in the Southern District of Florida, and elsewhere, while aboard a vessel subject to the jurisdiction of the United States, the defendant,

**YUSIEL LOPEZ INSUA,**

being then and there the captain, engineer, and other person employed on a vessel, that is, the tugboat WOOD CHUCK (Identification No. FLZN6951A291, Vessel Registration No. FL9726HG) attached to a floating barge (Identified as FB 70), by his misconduct, negligence, and inattention to his duties on said vessel caused the life of any person to be destroyed, that is, INSUA caused the vessel to impact a sailboat destroying the life of Victim 1, Victim 2, and Victim 3, in violation of Title 18, United States Code, Sections 1115 and 2.

JASON REDING-QUIÑONES
UNITED STATES ATTORNEY

MICHAEL GILFARB
ASSISTANT UNITED STATES ATTORNEY

DANIEL ROSENFELD
ASSISTANT UNITED STATES ATTORNEY

TANNER STIEHL
SPECIAL ASSISTANT
UNITED STATES ATTORNEY

13

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

v.

Yusiel Lopez Insua,

_____/
Defendant.

CASE NO.:  **26-CR-20122-BECERRA/TORRES**

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)
☑ Miami   ☐ Key West   ☐ FTP
☐ FTL   ☐ WPB

I do hereby certify that:
1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.

3. Interpreter: (Yes or No) Yes
   List language and/or dialect: Spanish

4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   ☑  0 to  5 days
   II  ☐  6 to 10 days
   III ☐  11 to 20 days
   IV  ☐  21 to 60 days
   V   ☐  61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Judge _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

By: _____
Daniel Rosenfeld
Assistant United States Attorney
SDFL Court ID No.   A5503081

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**   <u>Yusiel Lopez Insua</u>

**Case No:**   _____

Count #: 1

Seaman's Manslaughter _____

Title 18, United States Code, Section 1115 _____
* **Max. Term of Imprisonment:** 10 years
* **Mandatory Min. Term of Imprisonment:** N/A
* **Max. Term of Supervised Release:** 3 years
* **Mandatory Min. Term of Supervised Release:** N/A
* **Max. Fine:** $250,000

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

United States of America                      )
            v.                                   )    Case No. **26-CR-20122-BECERRA/TORRES**
Yusiel Lopez Insua,                           )
                           )
        *Defendant*                         )

## WAIVER OF AN INDICTMENT

    I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

    After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: 3/21/26

*Defendant's signature*

*Signature of defendant's attorney*

WALTER REYNOSO
*Printed name of defendant's attorney*

*Judge's signature*

*Judge's printed name and title*